Okay, the first argued case this morning is number 16, 1856 EMC Corporation v. Zerto Incorporated. Mr. Lowery. Thank you, Your Honor. We'd like to reserve five minutes for rebuttal. Okay. Matt Lowery of Foley & Lardner on behalf of Colin Zerto. There's a lot of issues in the case. I thought I'd begin with the validity of the 460 patent as in the briefing. And for the validity of the 460 patent, that's the one that's mirroring using the Internet rather than a dedicated client. Is this the one that focuses on the Eni and the Zaro references? Yes, Your Honor, in the first challenge on validity, and that's what I think I'd like to talk about today. There's no question that the issue is whether it would be obvious to use the Internet for data communication in ENOC where it had a dedicated client. The experts agreed on appeal. We all agree. There's also no question that the 460 patent teaches virtually nothing new, for sure, about using the Internet in the particular context. The entire disclosure is column 6, for the most part column 6, lines 6 through 22 or 21. What page are you at? I'm in the 460 patent, column 6, lines 6 through 21. And it's a single paragraph, and all it says is you can use the Internet. And since most user sites and target story systems are located... And this is at 162, the joint appendix, right? Yes, Your Honor. Yes, exactly. And that paragraph is the disclosure of use of the Internet. And all it says, really, throughout the paragraph, is that no significant cost will be incurred because everyone has easy access to the Internet. It's not how to use the Internet. It's simply noting that it's there. In the next paragraph, it talks about using an intranet or private network. And at lines 36 through 38, they note... Well, actually, at the beginning, it says it's at line 24 to 5. An intranet is similar to the Internet. And then at 35 to 38, it says it's inexpensive using an existing network requiring little or no changes to the network configuration. You can just use it. And if you want to know what kind of an interface you use, in column 7, lines 55 to 61, standard PC modes. If you want to know about load balancing or encryption, conventional techniques. So there's no question that the 460 patent doesn't solve any problem using the Internet. It just says you can use the Internet for data communication in this context. In the yellow brief at 43, you argue that to... I'm quoting you. You don't need to. To rely on the testimony in Zerto's opening brief, one must first make the unsupported assumption that RapidParts was running Microsoft Exchange when the testimony was only that it used email by Microsoft. I had a scribble note. At that time, did Microsoft offer email services other than Microsoft Exchange? Outlook. Yes, sir. And returning to the 460 patent, and I believe that was in the record, by the way, that there were alternative emails including Outlook. I didn't just make that up, although I don't have a record site. The Zero patent also unquestionably teaches use of the Internet. Again, not disputed. Use of the Internet in the context of mirroring for storage. So all of this was presented to the jury who didn't agree? This was presented to the jury who didn't agree. There's some significant questions about how much it... Well, Your Honor, it's not clear whether they agree because it was a verdict where they found... No, no, I'm sorry, it is clear. They did not find... That's on the 395 and the 091. The 395 and the 091 were... That's where you have the inconsistent is allegedly issue. Actually, it's for all of them. So the 395 and 091, there was a dependent claim infringed without the independent. For the 867 patent, they found contributory infringement but no inducement. They found the customers did not directly infringe while Zerto U.S. did, except that the supposed infringing act would have to be putting the code onto the customer's computer. I mean, there was no way that you could have both of those things. And for the 460 patent, they found three of the independent claims non-infringed and one infringed. And the district court called that logically incomprehensible. It was actually logically incomprehensible for all of the patents. But the district, but the judge did find that there was enough evidence on the side of the final judgment. The judge found... To find substantial evidence, and isn't that the question before us that needs to be overcome? Yes, Your Honor, although it depends on the issues. So, for example, for the 460, obviousness is a question of law. With underlying facts. With underlying facts. But I would suggest that if one takes KSR at its face, that the predictable application of the known technology is obvious, that's it. Because there's no underlying fact dispute. The internet, the 460 patent teaches nothing about how to use the internet other than what's already known. Xero teaches it in this specific context. There's really nothing left but the legal question. Did you have the teaching, though, of using the network cloud to mirror storage systems? Yes. Where is that shown in the prior art? That is the Xero reference. Xero is a mirroring system where the internet is used for the data communication. And that's not disputed. What EMC argues is that, well, Xero has host computers, and Xero has host computers, whereas… Well, is Xero between the storage systems? Whereas the patent and UNI is between storage systems. And isn't that a significant factor, though? No, Your Honor, actually it's not. Because there's nothing about use of – it teaches it in the field of mirroring. And we know from the 460 patent, among other things, that there's nothing special about using the internet for mirroring between storage controllers. And it's already taught for mirroring between host computers. And so there really is nothing left. And, in fact, the MUNI auction kind of rejected this notion that we're going to narrow it down. If one can narrow it down to require, for example, storage controllers, that's to require an anticipation. Because the only way you could actually have a teaching would be in the exact context of the patent, in which case it's anticipation. That's not required, I respectfully submit. Really, all that's required is what we have, is Xero teaches the internet. I don't even know, honestly, if you need Xero, because people knew about the internet. But Xero is icing on the cake. It says, for mirroring of data, worries about data loss, whatever, in this context of mirroring backups, you have a teaching of use of the internet. And nothing surprising about its application. In connection with, while it's not clear to me that a motivation to combine is required after KSR, because this is a predictable application of a known technology, it's undisputed at trial that it's cheaper to use the internet than to set up an existing line. And there's no surprise there. That's not something that was discovered in the 460 patent. I might move on, unless there's further questions, to the contributory infringement point. Because I think it, well, it doesn't matter what I think, but it's of interest in the case. The only evidence here, certainly that was presented to the jury, that Xerto knew about the patents was the complaint. There's no contention on this appeal that they were aware of any of these patents before they got sued on them. And so then the question is, is that sufficient to prove contributory infringement the intent? And again, this is another inconsistency, because for indirect infringement, the jury found contributory, but not abusement. But I would suggest here there's no evidence of, sufficient evidence of intent. Because under this court's decision in the Warsaw case, and more recently it's Konieczny-Clave-Phillips v. Zoll Medical, if there is a reasonable non-infringement position, then one can't find intent. And here, if you look at EMC's briefing, there's no suggestion that there's not a reasonable position for non-infringement, nor could they really. For each of the patents, the jury did not find infringement more often than it actually found infringement. And so what Judge Sleet did with that is he said, look, the jury could have found infringement or found no infringement on these same issues. Which is to say, right or wrong, the belief was reasonable. The defense was reasonable. Judge Sleet actually says so by saying the jury could have found either one. And in fact, in this case, found both. And that should be, we think, now not all of the non-infringement defenses are involved in this appeal. But I thought I might move to the non-infringement one for the 460 patent, just so the court has a better understanding. I was looking at the briefing and I thought it was a little hard. So to explain the Zerto system, again, this isn't in dispute. You could think of it like an artist making a painting. You have the current painting as the production side. In Zerto, you have a recovery disk, which is the painting as it existed four hours ago. So it's deliberately old. And then you have a journal that is each of the brush strokes that have been made in the last four hours. So that's each of the computer write transactions. So in the Zerto system, if you want to know what this looks like, you can roll your four-hour-old painting forward, do all those brush strokes to it, and you end up with the current thing. If you want something two hours old, you can roll it forward two hours of brush strokes, and you get something that's two hours old. So we're talking about whether it mirrors the recovery disk is a four-hour-old painting. It's not a mirror because it's too old. The journal is the writes, the brush strokes. It's not a mirror because it doesn't look like a painting. So what AMC has argued is that any sending of an individual brush stroke is sufficient for there to be mirroring. It's quite explicit on page 44 of their brief. But the patent says when you do something for backup, you write and mirror. Writing alone is insufficient. And that is the only evidence at issue, and it's not substantial evidence. And the reason I say it's the only evidence is page 44 of the brief. That's their argument. I think I'd like to just jump quickly to the 867 and maybe the pseudo-snapshot patents because I'm running low on time. For the 867 patent, the question there is the claim requires that you cause the host controller to halt processing. It goes on to say you can halt and you can resume. AMC's theory, again, not disputed. If you shut off all the sources to the host, it would still process anything that arrived, but nothing's arriving. Therefore, you have caused it to— Isn't that effectively closing it off, though? It is effectively, Your Honor. And if this were a doctrine of equivalence case, we'd have an argument, but they stipulated to no equivalence. What they do, they close down the application. They close down the generation of rights. And the problem there is under HP versus Musetech, among others, that's not literal infringement. So in the Musetech case, it involved the claim requires selecting a scan speed. The accused infringing device, you selected a resolution, which resulted in— You're saying the problem here is just the controller isn't the one shutting it down. It's different to shut down the controller than it is to shut down what's feeding the controller. And I think that— Wasn't this kind of a factual issue for the jury to decide? I don't think so, Your Honor, because it was actually no dispute as to what's happening in the system, only a dispute as to what it means. And so to literally meet it, that claim language, it's a matter of claim construction. Do you need to actually cause the host controller to do it so it can't— Was there a—and we have a big record here, as you indicated at the start. But was there a claim construction on this issue about what meant to be shut down, that it had to be the controller, it wouldn't be enough if the right wasn't coming in? There was not a claim construction on that particular issue. We didn't think the claim construction as it was provided would permit the theory that was ultimately argued by AMC. I only have a little bit of time left if I could reserve some more questions. Okay. Yes, we'll save the rest of your time, Mr. Lowery. Thank you, Your Honor. Mr. Rader. Thank you, Your Honors, and may it please the Court. I'd like to do two things with my time. I'd like to briefly address the verdict form, and then I'd like to explain why we are asking this Court to reverse on the injunction issue in order that the district court enter an injunction, just as this Court did in both the Robert Bosch case and the Douglas Dynamics case. I'll start briefly by addressing the verdict form. I'm sorry, Mr. Rader, to change your plans here a little bit, but what do you have to say about opposing counsel's argument with respect to the 460 patent? You heard the arguments that he was making on that. With regard to Marion, Your Honor? Yes. With regard to Marion, it's very clear. The district court's construction was a two-part construction with the word by in the middle of it that essentially said what you need to do is to keep a copy, a full copy of the data, by copying each right and sending it over to the other side. That's exactly the way that Zerdo is going. No, I'm sorry. I was thinking about the validity issue with respect to Yanai and Zaro. Okay. Absolutely. He says that it wasn't enough that what you have here is using the cloud to transfer or to mirror between storage systems. So the issue was whether it would be obvious to take the network cloud as disclosed in Zaro, which was only between host computers, and use it to replace the dedicated link of Yanai. And this argument was based on those two references that Dr. Zadig, who was respectfully very unprepared for trial and, therefore, the jury, was happily entitled to disregard his testimony. It was based solely on his testimony that there would have been a reason or a motivation to do that based on either the internet being cheaper or the notion of redundancy. This is exactly the combination that the Board of Appeals of the Patent Office had expressly rejected on appeal from prosecution, from a 13-year prosecution. And the Patent Office credited the conclusion that even if, and this is all on the record and the jury had the file history, even if you combine those two references, you wouldn't get what was claimed. You would keep the dedicated link of Yanai for the reasons that Yanai says. If you look in column one of Yanai, it talks about protecting the data from banks, stock exchanges, critical data that cannot be lost, and that you have to know for sure it's been received by the other side by getting an acknowledgement over a high-speed line. So there were clear reasons in the references themselves why you would never do that. And Mr. Justice, EMC's expert, explained two things. One, that in his extensive experience working with these dedicated lines in the prior art, which Dr. Zapp didn't have, there would have been a very clear reason not to substitute the network cloud because of the, as he characterized it, the very scary risk of losing data. Okay, I detoured you. I'll let you get back now to what you wanted to start with. Thank you. All right, thank you, Your Honor. So very briefly on the verdict form, I'd just like to put the verdict into context. So we had a two-week trial. The jury returned a verdict that in one respect nobody disputes there is infringement of four EMC patents. We know that because at the beginning of each section of the verdict form, it says check yes or no as to whether there's infringement, and they checked yes. There was a jury instruction that said it was sufficient for them to hold Zerto liable for infringement if they found infringement of, quote, one or more claims. And for each one, they checked one claim. So they clearly found infringement of four patents. They rejected all of Zerto's invalidity arguments. They awarded EMC 72% of the damages that EMC had asked for. All of this after Zerto presented a technical expert on infringement and validity who had never installed Zerto's own product on which he offered an opinion, had never used it, and had never looked at the source code for it. He learned about the product in a one-hour telephone conversation on the day his expert report was due. I couldn't find the foundation for that in the record. Sure. I have the discussion of the call, but there's no actual foundation for it. Who, what, when, where. Who was on the call, when did it take place, and so on. I believe it's appendix 2004, Your Honor. OK. OK. On appendix 2004. January 9, 2015. I really don't see enough to establish a foundation. Well, starting at line 16, he was asked about the conversation with Mr. Oded Kedem, who's the CTO of Zerto, that had occurred on January 9, 2015, which was the day he submitted his report. And then he was asked whether that conversation about how the system functions was before or after he signed his report on that day. But then I don't get an answer, because I go to page 2012. And apparently page 2005 is not in the appendix. It's always helpful to make sure we have what we need when there's a specific point. It's difficult because we have rules about not putting things in the appendix that aren't expressly cited. But would you want some additional pages provided? Is it there? We're happy to provide it, Your Honor. If that would be helpful to the court. I'm happy to take counsel's word, Your Honor, Officer of the Court. Is the rest of it there? Well, send us a few more pages. Okay, we'll be happy to do that. I'd like to just segue back to what the point is. The point is, at the time the jury rendered its verdict, and when the court entered its judgment 13 days later on May 21, there was no doubt about who the victor was. In fact, the court, when it entered judgment, and this is docket... I'll give you, by the way, the expert is useless. Thank you, Your Honor. The district court's judgment, which was entered on May 21, which I believe is DI 213, entered judgment for EMC and against Zerto, and importantly, did not enter judgment for Zerto on any of the unchecked claims. So the judgment itself is completely consistent with EMC's view of the verdict form. What the district court did not do was make any effort to read, and this is a violation of law, did not make any effort to read the verdict in a light that would be consistent with the jury instruction. You're relying there on that Third Circuit law that says, one of the rules I guess the circuit has is that when, if at all possible, we should read a jury verdict consistently. That's correct. That's the law on the Third Circuit, and I think it's the law on every circuit, Your Honor. I think that comes ultimately from the Supreme Court. The jury instructions here said if you find, to find a dependent claim infringed, you must also find the independent claim infringed. So by checking off a dependent claim in the 091 and 395 patents, the jurors, if they follow the instructions, which they must be presumed to have done, were necessarily finding infringement of the independent claim as well. There's no inconsistency there. Now, Your Honor, I'd like to quickly move on to the injunction, because that's critically important to EMC. I'll start very briefly with irreparable harm. Although the district court found the irreparable harm factor weighed in favor of EMC, I think it's important to pause on it for a second, because the district court used, you know, I think an oxymoron when it described the irreparable harm factor as weighing only, quote, slightly in favor of EMC. This, in fact, is the prototypical case of irreparable harm, as the district court's actual factual findings show. One, as the district court found, Zerto aggressively competes with EMC. Two, Zerto has taken customers from EMC. The record shows that at that early time, they had already taken 20% of the customers that EMC had attempted to get. Three, EMC, quote, does suffer competitive harm. Four, a causal nexus exists between the infringement and EMC's harm, and moreover, that EMC was losing downstream revenue as well. On Appendix 28, the district court recognized that and posited without any foundation that the parties could somehow do a financial arrangement that would account for it. Your Honors, to the extent that the characterization of the irreparable harm factor as weighing only, quote, slightly in favor of EMC had played any role in the denial of the injunction, that would be a clear error in judgment that this court should reverse, just as it reversed in the Robert Bosch case when the district court didn't even find irreparable harm, and this court said, no, there was irreparable harm. It was a clear error of judgment. We're unaware of any precedent in which an irreparably harmed patentee in a competitive environment was denied an injunction except when there was a lack of causal nexus. Here, the district court found causal nexus, and Zerto does not challenge that finding on appeal. Now, the district court also found that monetary compensation would adequately compensate. So can it be irreparable if it can be adequately compensated? And I would turn around and say, can it be adequately compensated if it's irreparable? Your Honor, that's the next thing I wanted to do, is to address Factor 2, the adequacy of money damages. Under this court's decision in Apple III, which is 735F1352, the 2013 Apple decision, it's directly on point. The only factor that the district court cited for the adequacy of money damages were three licenses that the EMC signed with three of the largest companies in the world, IBM, Hewlett Packard, and Hitachi. The district court did not even consider the context of those licenses, which is absolutely critical. It was legal error not to consider the context. And what we're going to suggest is that you don't need to send it back to the district court to consider the context because it's so clear from the face of those licenses. All three of those licenses were portfolio-wide licenses in which EMC and these three huge companies cross-licensed each other under tens of thousands of patents to get what? To get operational freedom to run their entire businesses. That is completely unquantifiable, and doesn't suggest for one moment that EMC licensed any of these patents, quote, for money or that money would be an adequate measure of the value of patents. So I'll make sure I understand exactly what would you want the injunction to say? What we asked for before the district court was a standard injunction that prohibits the further importation, sale, et cetera, of the products that were found to infringe. And, of course, it would include any product found colorably distinct. That relates to, well, I just want to make one more point about the licenses. In addition to the critical fact that they were portfolio-wide and don't reflect the adequacy of money damages, there's only one license that covered all four patents. The IBM and Hitachi licenses covered only the 460 patent. And, by the way, only because of a capture period. It's not as if the 460 patent was named. It didn't exist. There was a capture period that for applications filed within a certain time period, they'd be included in this cross-license. I'm uncomfortable with your argument to the extent that if we reverse the district court, I'm uncomfortable with fashioning an equitable remedy as opposing to letting a district court do it. I hope I didn't misspeak. What we're asking this court to do is to reverse and tell the district court to fashion the injunction in the first instance. The last point on the injunction before I have to get to the balance of the harms is that the only license that covered all four patents was the Hewlett-Packard license. And that license resulted from a settlement. And that's reflected at page 4673 of the appendix. And this court has stated on multiple occasions, perhaps most recently in Apple 5, 809 F3rd 656, it was Judge Raina concurring, that a license that results from settlement of litigation does not reflect the adequacy of money in exchange for a license to that patent. So the only patent that covered the four was a settlement. And that's an additional reason why when you just look at these licenses and their terms, de novo, you should find that factor number two weighs in favor of granting an injunction. Lastly, because I have less than two minutes, on the balance of hardship, the only factor that the district court considered was the size of Zerto and the fact that to them it's a core product and that EMC's competing product is a non-core product. The district court also mentioned the fact that there were other competitors in the market such that EMC can't definitively prove that every sale Zerto makes is a lost sale. Those were exactly the facts of Robert Bosch. And Robert Bosch said, where the parties are direct competitors, quote, a party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one. That's the age old rule that Chief Justice Roberts was referring to in his concurrence in the eBay case of the Supreme Court. I don't want to eat up all the rest of your time, but I want to know where in the record it says that that phone call we discussed before is the first time he learned of the ZVR software. So I didn't memorize the pages not included in the appendix. I can tell you that I took his deposition and I asked that question. And so as an officer of the court, I can tell you I know for sure that that's true. So then you're going to include those pages. Yes, send us some of those deposition pages. There's one last point here, if I may, on the balance of hardships, which is in addition to the core versus non-core distinction, which is an improper reason for finding the balance of hardships to tip for the infringer under Bosch, there's another critical factor under the Douglas dynamics decision in which this court also reversed and ordered the district court to enter an injunction. The critical fact there was that the infringer said it had a non-infringing alternative ready, which it could easily deliver to the market. And it's the same thing here. Zerto has told the court that these patents are of minimal value, that only 1% of their customers use the Rokiki and H67 patents, and has also represented to the district court in DI 327 that it's designed around the 460 patent, just like the defendant in Douglas dynamics, Your Honor. And this court found that where there was irreparable harm to the patentee on the one side, and on the other side you had an infringer that claims it's designed around and the patents are of minimal value. Quote, if indeed buyers, which was the defendant, had a non-infringing alternative, which could easily deliver to the market, then the balance of hardships would suggest that buyers should halt infringement and pursue a lawful course of conduct. Here, the district court inexplicably found the balance of hardships to weigh, quote, strongly in favor of Zerto. And as a matter of law, it's the opposite on these facts under Douglas dynamics. So we ask the court under the Bosch and Douglas dynamics decisions to actually reverse the district court and order the district court to fashion an appropriate injunctive remedy. OK. Thank you, Mr. Rizzo. OK. Will you add another minute to the rebuttal time? Let me make it four. Thank you, Your Honor. I can say to a certainty that Dr. Zadok was familiar with the software before the day before his report was due. I don't know when he talked to Zerto, but he was certainly looking at the materials. I want to go to just really briefly on the- Do you want to submit anything from the record for that purpose? Well, perhaps, Your Honor. If there's anything more that should be added to the record, would both of you, based on our discussion today, just send it in within a week at the most? Will do, Your Honor. But I think the more important point is that we're not really relying on what Dr. Zadok said anyway. We're relying on undisputed facts like the Internet was known, the Internet was known in the context of murdering and whatnot. In connection with the argument that there's no doubt who won, the district court called the verdict logically incomprehensible, and it doesn't withstand scrutiny. It said, check off every box where you find infringement, and they checked dependent claims and not independent claims when the instructions say you can't do that. But isn't it possible to reconcile it? I mean, you had jury instructions that were very clear, and the jury sat there and it specifically- Is it unreasonable, given the Third Circuit admonition to try and reconcile inconsistencies, to say, well, they checked, I guess it's Claim 2 in the 395 and Claim 5 in the 091, so they necessarily concluded that the requisite independent claim was infringed. And that's what Mr. Rader's basically saying. Well, yes, except they didn't actually indicate that they found that it was infringed, which is why the district court looked at this issue and found it to be inconsistent. I'd like to get to the injunction if I could, since that's obviously of critical import. The only thing AMC asked for was an injunction against all sales. When they come in and say, we say there's a design around and we have designed around, if they agree, we're virtually done here in connection with the future royalty, or an injunction, the problem is they don't agree, and we will just have more litigation over whether it can be designed around. Is there a problem with an injunction that says you can't import infringing items? Yes, that one would actually be overly broad. The injunction needs to be clear as to what's prohibited. And, indeed, as AMC argues it, this would put us out of business. And the design around is not for all of the patents in any event. But when AMC says that we argue that there's only 1% that's infringing with respect to the 867 and the pseudo-snapshot patents, that's part of why in a request for, which is the only thing they presented to the district court, a request for a full injunction on all of the products is grossly overbroad. In connection with the balance of the harmships, AMC argues that size is not dispositive. The district court didn't treat it as dispositive, and it wasn't even looking at size. It said this is the factor that tips the scales heavily, and it said it's 100% of Xerto's products. It doesn't matter how big. Xerto could be very large or very small. It puts them out of business. And it doesn't do that or even really materially affect AMC's business, and that's why the balance of the hardships weighs heavily in favor of no injunction. In connection with irreparable harm, AMC likes to argue this market segment, virtual machines, and whatnot. And I think it's worth noting that not only did the district court decide that that was too narrow, the district court further found, I mean, there was further evidence in the record that there were eight competitors within the virtual replication space. That's Appendix 5827 to 33. Eight in addition to EMC and Xerto. So an injunction against Xerto would remove one of the ten. And so the district court reasonably concluded that EMC had not shown any particular lost sales or that if Xerto were not in the market, EMC could make a sale given differences of price points and other people in the market. In connection, actually I'm almost out of time. Okay. One last sentence. Well, thank you, Your Honor, for your attention. And I think that's enough for the questions for now. Okay. Thank you both. The case is taken under submission.